## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| **CASSANDRA LACEY and JADEYN LACEY,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. |
| **CITY OF BLOOMINGTON, ILLINOIS,** ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT AT LAW

NOW COME Plaintiffs, CASSANDRA LACEY and JADEYN LACEY, by and through their attorneys, Parikh Law Group, and for their Complaint against the Defendant, City of Bloomington, Illinois state as follows:

## PARTIES

1. Plaintiff Cassandra Lacey ("Cassie") is an adult resident of Illinois.

2. Plaintiff Jadeyn Lacey ("Jadeyn") is an adult resident of Illinois.

3. Defendant City of Bloomington ("City") is a municipal corporation organized under the laws of the State of Illinois. The City operates the Bloomington Police Department, a law enforcement agency located in Bloomington, Illinois, which employs sworn police officers and detectives with the authority to investigate crimes, make arrests, and initiate criminal proceedings within the City's jurisdiction.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights) as this action arises under 42 U.S.C. § 1983.

1

5. Venue is proper in the Central District of Illinois, Peoria Division, pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to this action occurred within this judicial district.

## BACKGROUND FACTS

6. At all times relevant to this dispute, Jadeyn was a Registered Nurse duly licensed to practice in the State of Illinois.

7. At all times relevant to this dispute, Cassie was a Registered Nurse, duly licensed to practice in the State of Illinois.

8. Beginning in or around November 2022, Jadeyn and Cassie (together referred to as "Plaintiffs") began a medical spa focused on providing IV hydration and other essential wellness services including red light therapy and sound healing, reiki, massage & BARS therapies.

9. Through the operations of the wellness spa they owned and operated, the Plaintiffs earned a reputation within the community and developed a book of business of over 300 clients.

10. In or around January 2023, the Plaintiffs were approached by officers and agents of an existing medical clinic, called Blueze Wellness, who sought to enter into a mutually beneficial business arrangement with the Plaintiffs' medical spa.

11. Blueze Wellness is a medical facility owned and operated by Dr. Joel Nilles ("Dr. Nilles") and Chantel Webb ("Webb"). Dr. Nilles and Webb, a married couple, approached the Plaintiffs and offered the opportunity for the Plaintiffs to operate their medical spa in conjunction with the Blueze Wellness facility.

12. In March 2023, Plaintiffs entered into an oral agreement with Dr. Nilles and Webb to bring their medical spa practice under Blueze Wellness, which resulted in the Plaintiffs forming "Blueze Hydration LLC" ("Blueze Hydration") as an Illinois entity to provide medical spa services as part of its arrangement with Dr. Nilles and Webb.

13. Blueze Hydration was formed as a separate LLC, with both Plaintiffs, Webb and Dr. Nilles listed as managers of the company, on March 31, 2023.

14. Plaintiffs brought their established patient base of 300+ clients, professional reputation within the community, and years of experience in medical services to the newly formed Blueze Hydration business venture. Further, they brought all of the supplies to operate, development and knowledge of protocols and policies to operate, and Square system to schedule patients and accept payments.

15. The parties agreed that Blueze Hydration could benefit from the association and oversight provided by Blueze Wellness, while Blueze Wellness could benefit from the profits realized by Blueze Hydration, in large part due to Blueze Hydration's existing business model and book of business.

16. The Plaintiffs brought with them tools and equipment to the new business. Specifically, the Plaintiffs possessed a business Square account, a tool used by small businesses to schedule clients for appointments and receive credit card payments.

17. After establishing the new company and moving equipment, supplies, and other assets to the Blueze Wellness clinic, in or around April 2023, the Plaintiffs began seeing patients.

18. Within a very short period of time, the relationship between Blueze Wellness and Blueze Hydration became strained. The oral understanding between the parties became

3

contested, with Blueze Wellness claiming the Plaintiffs owed monies and services the Plaintiffs did not agree to when moving their business to Blueze Hydration.

19. By July 2023, Webb and Dr. Nilles were engaged in efforts to unlawfully remove Plaintiffs from the business, despite Plaintiffs' status as authorized LLC managers.

20. In particular, the means by which Blueze Hydration received payments became a point of contention. By July 2023, Webb demanded that all payments received by Blueze Hydration go through Blueze Wellness' Clover system rather than through the Square account owned solely by Blueze Hydration.

21. Webb also demanded Plaintiffs employ her "accountant", Kelly King, to manage the company books. Despite this arrangement, the books were not properly maintained and Plaintiffs later came to learn that King was not an accountant but a bookkeeper.

22. While the Plaintiffs owned their Square account prior to agreeing to forming a business relationship with Blueze Wellness, both Webb and Dr. Nilles began questioning the handling of the Square account, demanding an accounting for expenses incurred from the account, and demanding a share of the profits from the Square account that was inconsistent with the agreement the Plaintiffs reached in March 2023 with Blueze Wellness.

23. On or around July 17, 2023, Chantel approached Jadeyn and stated that Kelly needed access to the Square account in order to do the books. She stated Jadeyn needed to give the login information and password to Danielle. Chantel told Jadeyn that if he did not do this there would be issues and consequences, so Jadeyn gave Danielle the information. The Square account was put into Danielle Eden's name. Danielle Eden was the manager

of Blueze Wellness. Danielle was never a part of Blueze Hydration. When she took over the Square account, Cassie and Jadeyn had no access to make patient appointments or take any payments either. Danielle and Chantel also downloaded all of their previous business records, financial information and patient information in violation of HIPAA.

24. On July 17, 2023, Danielle and Chantel completely and unlawfully took control over the Square account and locked Jadeyn and Cassie out.

25. On July 21, 2023, Webb summoned Dr. Nilles, Cassie and Danielle, the office manager of Blueze Wellness, to attend a meeting, but required that Jadeyn not attend. At this meeting, Cassie was threatened by Dr. Nilles multiple times in an effort to force her to abandon Blueze Wellness and assign Dr. Nilles and Webb total control over the company.

26. On Wednesday, July 26, 2023, when Plaintiffs came to work, Danielle met them at the door and told them they were not allowed inside. She threatened to call the police. She demanded the keys and so they gave her the keys to avoid having the police called on them, and had Danielle sign something as proof she received the returned keys.

27. From July 26, 2023 and onward, Cassie and Jadeyn were not allowed to go back in for their personal belongings or the supplies valued at over $10,000 they had provided to the business.

28. Later, they came to learn that Joel and Chantel attempted to return all of the supplies purchased by Plaintiffs to Henry Schein company for cash. Webb and Nilles also later dissolved the LLC without Cassie or Jadeyn's knowledge or approval, despite Plaintiffs' status as authorized LLC managers.

5

29. When their efforts to coerce the Plaintiffs to give up the business the Plaintiffs built up over the course of several years failed, Webb resorted to a plan to have the Plaintiffs arrested on demonstrably untrue criminal allegations.

30. On July 26, 2023, Dr. Nilles contacted an officer with the Bloomington Police Department, namely Timothy Carlton ("Carlton"), to accomplish through criminal process what Dr. Nilles and Webb could not otherwise force upon the Plaintiffs.

31. Carlton and Webb were romantic partners.

32. At all times relevant herein, Carlton was employed by the Bloomington Police Department, which is the law enforcement division of Defendant City.

33. Webb and/or Dr. Nilles contacted Carlton directly on his personal cell phone in an effort to convince him to initiate criminal proceedings against Plaintiffs over the parties' business dispute.

34. Dr. Nilles and/or Webb knowingly and falsely claimed the Plaintiffs had committed theft through unauthorized use of the Square payment processing system, despite having no evidence or good faith basis to support the allegations. In fact, at all relevant times the Square account was owned by the Plaintiffs.

35. Any reasonable investigation into the allegations would have readily and easily established the baselessness of the claims reported directly to Carlton.

36. Webb and Dr. Nilles were motivated to falsify a criminal report based solely on the Plaintiffs refusal to provide Blueze Wellness with the profits and funds demanded upon them.

37. At all times relevant herein, Carlton was acting under color of the law and within the scope of his employment.

38. Carlton derived his authority to investigate alleged crimes, seek arrest warrants, and initiate criminal proceedings solely from his position as an employee and agent of the Defendant.

39. The Bloomington Police Department vested Carlton with full police powers and authority, including the power to deprive citizens of their liberty through arrests.

40. On July 28, 2023, just two days after Dr. Nilles and Webb's false report, the Plaintiffs were arrested without any investigation into the veracity of the allegations privately communicated to Carlton.

41. Although police must be allowed some margin of error, they must utilize the means at hand to minimize the risk of error, and reasonable avenues of investigation must be pursued.

42. Here, the following facts would have been immediately apparent through minimal investigation, specifically:

   1. That although Webb had her office manager unlawfully take control of the Square account on July 17, 2023-just eleven days before Plaintiffs' arrests-by putting the Square account into Chantel Webb's own name and transferring all of the funds into an account with First State Bank which was Blueze Wellness' bank account, any minimal investigation would have immediately revealed that: (a) the Square account was created and owned by Jadeyn prior to forming Blueze Hydration in March 2023 and was associated with and attached to Jadeyn's social security

number; (b) Jadeyn had to call Square to put the account back into his name because of this association with his social security number; (c) Square informed Jadeyn that what occurred was a cyber crime; (d) Jadeyn and Cassie remained the legal owners and authorized users of the account; (e) Plaintiffs brought this existing Square system to the business venture as part of their contribution; (f) Webb's takeover of the account was unauthorized and constituted a cyber crime according to Square itself; (g) this takeover occurred just days before Nilles contacted Carlton; and (h) this suspicious timing demonstrated Webb and Nilles' ulterior motive to manufacture a false narrative of "theft" from an account Plaintiffs rightfully owned and controlled, while Webb herself had just committed what Square identified as a cyber crime against that very account.

2. That the bank account to which funds were added via the Square system and then from which funds were later removed by Plaintiffs was in fact owned and operated by the Plaintiffs;

3. That both Plaintiffs were listed as managers of the business;

4. That Plaintiffs had brought the Square payment processing system to the business venture from their pre-existing medical spa operation and maintained continuous authorized access as owners; that all written communications and business records would have demonstrated the parties' understanding that Plaintiffs retained control over their Square account; that Plaintiffs were purchasing supplies and managing day-to-day operations of Blueze Hydration using these systems; that the business arrangement was disputed and involved conflicting oral understandings rather

8

than any clearly written agreement transferring ownership of Plaintiffs' assets; and that the withdrawals in question were made from a bank account in Plaintiffs Jadeyn Lacey's name to which he had complete legal authority and access.

43. The City failed to establish or enforce Rules of Conduct, including but not limited to, policies prohibiting officers from investigating complaints made by individuals with whom they have personal relationships and/or are otherwise ethically conflicted. This absence of conflict-of-interest policies allowed Dr. Nilles to leverage his wife's personal relationship and the couple's professional relationship with Carlton to manipulate the Defendant police force without requisite institutional safeguards to prevent such abuse.

44. The City failed to establish, enforce, or train officers on policies requiring reasonable investigation before arrest. This systemic failure allowed the Defendant's agents to arrest both Plaintiffs without conducting any reasonable investigation into the unsubstantiated and easily disproven claims Dr. Nilles privately made to Carlton through their personal cell phones. The City's lack of oversight, supervision, and mandatory investigative protocols directly enabled this constitutional violation.

45. The City failed to adequately train its officers on their constitutional duty to investigate readily available exculpatory evidence before making arrests. Had the Defendant provided proper training and established mandatory investigative protocols, officers would have been required to examine basic evidence such as the checking account ownership linked to the Square account, which would have immediately established that Jadeyn owned the account and the complained of criminal conduct was baseless and the transactions were properly authorized.

9

46. The City's failure to supervise its officers and require supervisory approval for arrests involving obvious conflicts of interest directly caused the Defendant's complete failure to perform any investigation whatsoever prior to placing the Plaintiffs under arrest. This lack of institutional oversight and accountability created an environment where constitutional violations were inevitable.

47. The City's failure to establish policies requiring officers to review business documents, bank records, or other corroborating evidence prior to arrest, combined with its failure to train officers on these constitutional requirements, directly resulted in the Defendant failing to so much as seek to review any such evidence prior to placing the Plaintiffs under arrest. A basic policy requiring minimal investigation would have shown Plaintiffs' authorized status with the business and their own checking account, preventing this constitutional violation.

48. The City vested Carlton with official police authority and powers to authorize and initiate arrest proceedings, but failed to establish adequate policies, training, or supervision to prevent abuse of that authority when conflicts of interest existed.

49. The City's deliberate indifference to this obvious risk enabled Carlton, acting under the official police authority granted solely by the Defendant, to ignore and neglect the Plaintiffs' Constitutional rights and place them under arrest based solely on the request made by his former romantic partner without any institutional checks or oversight.

50. At all times relevant hereto, neither Nilles nor Webb were disinterested complainants or reasonably credible victims entitled to the presumption of reliability ordinarily afforded to crime victims.

51. The City's failure to train officers on recognizing and recusing from investigations involving personal relationships was patently obvious and demonstrates deliberate indifference. It could not have been objectively reasonable for any officer to believe probable cause existed when acting on allegations from a former romantic partner with obvious financial bias.

52. The obvious need for such training and the high likelihood that failure to provide it would result in constitutional violations establishes direct municipal liability. No reasonably competent municipal policymaker could have failed to recognize this risk.

53. It was not objectively reasonable for Carlton to believe probable cause existed when he failed to conduct even minimal investigation despite readily available documentary evidence, acted on allegations from a former romantic partner with obvious financial bias, and ignored the glaring conflict of interest his personal relationships created.  No reasonably competent police officer could have believed probable cause existed under these circumstances.

54. The City, as the entity with exclusive and final policymaking authority over its police department, had the sole responsibility and power to establish policies prohibiting its personnel from acting upon complaints from individuals with whom they have personal or professional relationships.

55. The City's failure to establish such policies, or alternatively, the City's failure to train sergeants and officers on handling such conflicts of interest, or alternatively the City's failure to supervise and ensure compliance with any such policies if they existed, directly caused Plaintiffs' unlawful arrests and constitutional violations.

11

56. This municipal liability arises not from respondeat superior, but from the City's own deliberate indifference to the constitutional rights of its citizens. The obvious need for these protections, combined with the City's complete failure to provide them despite having exclusive authority to do so, establishes that the City's own failures were the moving force behind every constitutional violation Plaintiffs suffered.

57. The City's failure to have adequate policies prohibiting its personnel, including its sergeants and officers, from acting upon complaints from individuals with whom they have personal or professional relationships, or alternatively, the City's failure to train sergeants and/or officers on handling such conflicts of interest, or alternatively the City's failure to supervise and ensure compliance with any such policies if they existed, directly caused Plaintiffs' unlawful arrests and constitutional violations.

58. The City, as the entity with final policymaking authority over its police department, is directly responsible for these systemic failures that made the constitutional violations inevitable.

59. The Defendant improperly authorized the arrests of both Plaintiffs without probable cause based solely on Nilles's unsubstantiated, private, and ulteriorly motivated verbal allegations.

60. Officers Michael Johnson and Jeff Widmer, who were agents of the Defendant's police department, arrested the Plaintiffs on July 28, 2023, physically taking both Plaintiffs into custody and depriving them of their liberties.  Neither Officer Johnson or Officer Widmer conducted any investigation prior to arresting the Plaintiffs.

61. The complete absence of any investigative steps, despite readily available documentary evidence that would have immediately disproved Nilles' allegations, supports an inference of malice and bad faith on the part of the Defendant. Where conflicting inferences may be drawn from evidence-one of good-faith actions and the other of actions inconsistent with good faith-the question of malice is for the trier of fact.

62. Carlton was aware that neither Nilles nor Webb were disinterested victims but rather biased parties seeking to use law enforcement to resolve a civil business dispute in their favor.

63. An officer cannot maintain probable cause by deliberately avoiding information that would negate it. The duty to investigate is heightened when, as here, readily available documentary evidence would immediately resolve the question of whether criminal activity occurred.

64. Here, Carlton's failure to pursue any of these readily available avenues of investigation was not mere negligence but a deliberate choice to proceed despite obvious red flags that should have prompted any reasonable officer to investigate further before depriving Plaintiffs of their liberty.

65. This deliberate avoidance of exculpatory evidence demonstrates bad faith and reckless disregard for Plaintiffs'' constitutional rights. Specifically, the Defendant-officers failed to pursue reasonable avenues of investigation, including but not limited to, by failing to: (1) review the LLC formation documents showing Plaintiffs' management authority; (2) examine Square account records demonstrating Plaintiffs' authorized user status; (3) interview other business partners or employees about the business arrangement; (4)

review bank statements or financial records that would have immediately shown the account belonged to Plaintiffs; (5) conduct any independent verification of Nilles' claims; and/or (6) investigate or recuse based on the obvious conflict of interest created by Carlton's personal relationship with Webb and the couple's ongoing professional relationship with Carlton as patients.

66. Here, the Defendant-officers failed to pursue reasonable avenues of investigation, including but not limited to, by failing to: (1) review the LLC formation documents showing Plaintiffs' management authority; (2) examine Square account records demonstrating Plaintiffs' authorized user status; (3) interview other business partners or employees about the business arrangement; (4) review bank statements or financial records that would have immediately shown the account belonged to Plaintiffs; (5) conduct any independent verification of Nilles' claims; and/or (6) investigate the obvious conflict of interest created by Carlton's personal relationship with Webb.

67. A municipality's culpable inaction, and its deliberate indifference to known risks establishes municipal liability under 1983. The City knew or should have known that officers inevitably maintain personal and professional relationships with members of the community, and that allowing those officers to investigate and arrest based on complaints from such individuals without policies, training, or supervision creates an unreasonable and constitutionally intolerable risk.

68. The City had exclusive control over establishing protective policies and providing training yet deliberately failed to act despite the obvious and substantial risk. This failure was not mere oversight but deliberate indifference to an obvious constitutional hazard.

69. The City's failure to address this obvious risk through policy, training, or supervision demonstrates the deliberate indifference necessary for municipal liability. This is not respondeat superior; this is direct liability for the City's own constitutional failures.

70. The City had the sole authority and obligation to establish policies and procedures to adequately train, supervise, and ensure officers follow policies requiring recognition of conflicts of interest when complainants have personal relationships with investigating officers.

71. The City's deliberate indifference to the obvious need for such training and policies, and actual implementation and follow-through to preclude such conflicts of interest, directly caused the constitutional violations described herein. The need for such training and policies was so obvious that the City's failure to provide them demonstrates not mere negligence but deliberate indifference to constitutional rights.

72. Where the risk of constitutional violation from a given policy or lack thereof is so obvious that a failure to address it demonstrates deliberate indifference, municipal liability attaches directly to the municipality. Here, the City's decision to allow an officer to investigate, authorize arrests, and initiate criminal proceedings based solely on the word of his former romantic partner-who has obvious financial motivation to harm the accused-without any policies prohibiting such conduct, training on recognizing such conflicts, or supervisory oversight, presents such an obvious risk that no reasonable municipal policymaker could ignore it.

73. The City's failure to prevent this predictable abuse of police power through adequate policies, training, and supervision is itself a constitutional violation attributable directly

to the municipality. The City had exclusive authority to prevent this violation and deliberately failed to do so.

74. The City's failure to prevent this predictable abuse of police power is itself a constitutional violation attributable directly to the municipality.

75. The United States of America establishes personal freedoms as an inalienable right, especially the freedom from unreasonable malicious prosecution and seizure of a person.

76. Here, there was no probable cause to place the Plaintiffs under physical arrest, depriving them of their fundamental liberty interests, and any semblance of an investigation would have established the lack of probable cause prior to the Plaintiffs' arrest.

77. Here, the Defendant City failed to conduct any objective investigation and instead relied solely on the unsubstantiated and privately made accusations of Carlton's ex-girlfriend who had obvious financial motivation to harm Plaintiffs.

78. While victim reports are ordinarily presumed reliable, this presumption does not apply when the complainant has personal relationships with investigating officers and financial interests in the outcome. Under these circumstances, reasonable avenues of investigation were mandatory.

79. The Fourth Amendment imposes an affirmative duty on officers to investigate potentially exculpatory evidence before making an arrest and prosecuting an individual, particularly when complainants have obvious bias or conflicts of interest.

**The Incarceration Experience**

16

80. At the time of their arrests and being taken into custody, Plaintiffs suffered additional multiple constitutional violations that compounded the harm of their unlawful seizure.

81. Having recently moved into their neighborhood, Plaintiffs were handcuffed and escorted down the block in full view of their neighbors, subjecting them to public humiliation and stigma before any determination of guilt or innocence.

82. Upon arrival at the police station, Officer Widmer and other officers demanded the passwords to Plaintiffs' cell phones. Plaintiffs were told, "We are going to get it one way or another," which Plaintiffs understood as a threat.

83. Under coercion and without a warrant or consent freely given, Plaintiffs provided their phone passwords. No explanation of rights or opportunity to consult counsel was provided prior to this demand.

84. Plaintiffs were later subjected to strip searches and cavity searches, photographed, and forced to change into jail-issued clothing. Plaintiffs' personal phones were taken as evidence, preventing them from accessing stored phone numbers despite signage stating detainees were entitled to phone calls. Plaintiffs were then placed in a holding area where officers and detainees were separated by a barrier. Detainees yelled, taunted, and harassed new intakes. The area was visibly unsanitary, with food debris and bodily waste on the floor. Plaintiffs were later confined to a shower room and locked inside for an extended period while officers relocated another inmate. The floor and surfaces were wet, there was no place to sit, and soiled mattresses were present. Plaintiffs were required to stand for a prolonged period, causing physical discomfort. Plaintiffs were then placed in cells with constant fluorescent lighting, no clock, no pillow, and minimal bedding.

17

85. Most egregiously, Plaintiffs were denied their constitutional right to make phone calls while in custody for over 33 hours, in direct violation of the SAFE-T Act. This denial was not mere inconvenience-it directly caused the death of Plaintiffs' pet, which was left alone at home without food, water, or care during their unlawful incarceration. When Plaintiffs requested multiple times to make phone calls to arrange care for their animal, they were refused.

86. Plaintiffs were eventually placed in cells with constant fluorescent lighting, no clock, no pillow, and minimal bedding. Plaintiffs received little to no access to water despite requesting it.

87. Jadeyn was not allowed any phone calls while in custody for over 33 hours, in direct violation of his constitutional rights.

88. When Jadeyn requested multiple times to make phone calls to arrange care for Plaintiffs' animal, he was refused. This denial directly contributed to the death of Plaintiffs' pet, which was left alone at home without food, water, or care during their unlawful incarceration.

89. Cassie was confined to a shower room and locked inside for an extended period. She was allowed out of her cell for only up to one hour per day.

90. Jadeyn, however, was never permitted to leave his cell and was not checked on during his detention. Jadeyn was given a powder drink mix but was never provided a cup, making it impossible for him to drink it.

91. The City's differential treatment of Plaintiffs and denial of basic necessities demonstrates systemic failures in training, supervision, and enforcement of detainee rights.

18

92. The City failed to adequately train its officers on the clearly established constitutional rights of detainees, including the right to make phone calls, receive basic necessities like drinking water, be allowed out of their cells particularly for non-violent detainees, and receive proper welfare checks.

93. The City failed to supervise its detention staff to ensure compliance with these basic constitutional requirements. The need for such training and policies is patently obvious - every detainee has the right to arrange for their affairs, contact family, and secure legal representation.

94. The City's failure to address this obvious need through policy, training, and supervision demonstrates deliberate indifference to detainees' constitutional rights. Had the City properly trained its officers, established clear policies, and supervised compliance, Plaintiffs would not have been denied phone calls for over 33 hours, and their pet would not have died as a direct result of this constitutional violation.

95. Jadeyn, a transgender man, was informed by jail staff that disclosing his transgender status and identifying as female was necessary for his safety. Despite this disclosure, Jadeyn was not housed with female inmates. Instead, Jadeyn was placed in a "violent offender" section of the male population, where he was subjected to extensive verbal harassment by male inmates while visibly exposed to them.

96. After several hours, Jadeyn was issued men's inmate clothing with a large tear in the crotch area, leaving him exposed and vulnerable.

97. Prior to this arrest, no one outside of Jadeyn's medical providers was aware that Jadeyn was a transgender man, and Jadeyn never wanted anyone to know this medical

information. Jadeyn was a patient of Blueze Wellness, and it was Dr. Nilles who shared the confidential medical information regarding Jadeyn's transgender identity with police. By disclosing this private medical information, Dr. Nilles and the police exposed Jadeyn and put him at significant risk during his incarceration.

98. The City's treatment of Jadeyn as a transgender detainee reflects a complete absence of adequate policies, training, and supervision regarding the constitutional rights and safety of LGBTQ+ individuals in custody. The City failed to establish or implement policies consistent with well-established standards for housing transgender detainees safely and with dignity.

99. The Prison Rape Elimination Act (PREA) and its implementing regulations, which have been in effect since 2003 and were finalized in 2012, mandate that facilities consider transgender detainees' safety and personal views regarding placement, and prohibit placement decisions based solely on genital anatomy. Despite these long-standing federal standards, the City failed to train its detention officers on proper procedures for housing transgender individuals.

100. The City failed to establish policies requiring individualized assessments of transgender detainees' safety needs. The City failed to supervise its staff to ensure compliance with constitutional requirements protecting vulnerable populations. The deliberate choice to place Jadeyn in a violent offender section of the male population - despite being informed of his transgender status and the associated safety risks - demonstrates that the City's failures were not mere negligence but deliberate indifference to obvious risks. The provision of torn clothing that exposed Jadeyn's body to hostile

inmates further demonstrates the systemic nature of these failures. These violations were entirely foreseeable and preventable through proper policies, training, and supervision.

101.    The multiple constitutional violations Plaintiffs suffered during their incarceration were not isolated incidents attributable to rogue officers, but rather the predictable result of the City's systemic failures to establish policies, provide training, and ensure supervision of its detention facility. The City's failures constitute deliberate indifference under Monell because: (1) the need for policies and training regarding detainee phone calls, Miranda warnings, conditions of confinement, treatment of transgender detainees, and proper arrest procedures is patently obvious and has been clearly established for decades; (2) the likelihood that the absence of such policies, training, and supervision would result in constitutional violations was so high as to be almost inevitable; (3) the City had actual or constructive notice of the need for such policies and training through widely available professional standards, federal regulations including PREA, and clearly established constitutional law; and (4) despite this obvious need, the City failed to act, demonstrating not mere negligence but deliberate indifference to constitutional rights. The City cannot claim these violations were unforeseeable or outside the scope of municipal responsibility - every aspect of Plaintiffs' treatment was within the City's exclusive control and directly attributable to the City's own failures to establish adequate safeguards.

102.    The totality of Plaintiffs' incarceration experience-from the public humiliation of their arrest, to the coerced extraction of phone passwords without counsel, to the degrading strip and cavity searches, to the unsanitary and inhumane conditions of

confinement, to the deliberate placement of Jadeyn in unsafe housing with torn clothing that exposed his body to hostile inmates, to the prolonged isolation without basic necessities that caused severe psychological harm including disorientation and hallucinations, to the knowing denial of phone calls that directly resulted in the death of their pet-demonstrates a pervasive and systemic pattern of constitutional failures directly attributable to the City's deliberate indifference. Each violation was foreseeable and preventable through proper municipal policies, training, and supervision that the City failed to provide.

103.     The City, as the entity with final policymaking authority over its police department and detention facility, is directly responsible for creating the conditions that made these violations inevitable. The City's failures in policy, training, and supervision were the moving force behind each constitutional deprivation Plaintiffs suffered.

104.     Had the City fulfilled its constitutional obligations to establish adequate policies, train its officers and detention staff, and supervise their implementation, none of these violations would have occurred. This is not vicarious liability for employee misconduct - this is direct municipal liability for the City's own deliberate indifference to clearly established constitutional rights.

105.     The causal link is direct and unbroken: the City's systemic failures created the conditions under which constitutionally inadequate treatment of detainees became standard practice, and Plaintiffs suffered the foreseeable consequences of those failures.

106.     This pattern of callous and reckless disregard for basic human dignity and constitutional protections, affecting both Plaintiffs but with particularly egregious

violations of Jadeyn's bodily integrity, sexual autonomy, and safety as a transgender individual, reflects the same institutional indifference that characterized the initial arrest - demonstrates a pervasive and systemic pattern of deliberate indifference to Plaintiffs' fundamental constitutional rights and a continuum of constitutional deprivations enabled by the City's deliberate failure to fulfill its obligations under Monell.

107.    Each violation compounded the harm of the unlawful arrest, inflicting severe emotional, psychological, and dignitary injuries that were entirely foreseeable and preventable. This pattern of callous and reckless disregard for basic human dignity and constitutional protections, affecting both Plaintiffs but with particularly egregious violations of Jadeyn's bodily integrity, sexual autonomy, and safety as a transgender individual, reflects the same reckless indifference that characterized the initial arrest - a continuum of the constitutional deprivations from the moment Sargeant Carlton authorized their seizure through their eventual release.

**The Criminal Proceedings and Complete Acquittal of Criminal Charges**

108.    After being released from jail on bond, Plaintiffs were forced to participate as Defendants in criminal proceedings against them and hire a criminal attorney, and incur attorneys fees and charges for the same.

109.    During the entire time Plaintiffs were released on bond and awaiting their criminal trial, they were unable to work due to the pending felony charges which came up

during background checks conducted by prospective employers, resulting in significant financial hardship.

110.     Later, after 480 days, Plaintiffs were faced a criminal trial before a jury of their peers, with the district attorney unable to provide even a basic explanation of the evidence it planned to use to support the baseless claims levied against the Plaintiffs.

111.     Indeed, despite the Plaintiffs' criminal attorney seeking for a bill of particulars, the Defendant refused to produce any responsive documents, demonstrating the lack of evidence supporting the charges.

112.     The prosecution's inability to articulate the specific factual basis for the charges, despite having had over a full calendar year time to investigate after the arrests, confirms that Carlton proceeded without any reasonable basis for believing criminal activity had occurred.

113.     Both Plaintiffs were ultimately acquitted with directed verdicts in the midst of the criminal trials, Cassie on the first day of trial and Jadeyn on the second day of trial.

114.     A directed verdict of acquittal is entered only when, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could find the defendant guilty beyond a reasonable doubt.  It is an extraordinary remedy reserved for cases where the evidence is so insufficient that allowing the case to proceed to a jury would be fundamentally unjust.

115.     The court's decision to enter directed verdicts for both Plaintiffs-before either case even reached a jury-demonstrates that the prosecution's evidence was not merely weak, but virtually nonexistent.

24

116.     This extraordinary result confirms that probable cause never existed at the outset of these prosecutions. If the Defendant could not produce sufficient evidence to survive a directed verdict motion after more than a year of investigation and discovery, it is inescapable that no reasonable officer could have believed probable cause existed at the time of the arrests based solely on Webb's unsubstantiated allegations.

117.     At trial, the court determined:

1.  There was no evidence that the complained of transactions were done without authority (in part because the financial account belonged to the Plaintiffs).

2.  There was a lack of testimony and/or evidence that the Square account was ever transferred to the Blueze Wellness.

3.  There was no evidence of intent to permanently deprive the owners of any amount such that a reasonable jury could find Defendants guilty of the crimes for which they were charged.

118.     The motion for directed verdict was granted, and the case was concluded, with the court finding insufficient evidence.

119.     Following their acquittals, both Plaintiffs' criminal records were expunged.

**<u>Extensive Damages and Ongoing Harm</u>**

120.     As a result of the false accusations, wrongful arrests, and subsequent criminal proceedings, Plaintiffs suffered severe emotional distress, trauma, and anxiety that continues to this day.

121.    Defendant City of Bloomington, as a municipal corporation with exclusive and final policymaking authority over its police department, is liable for depriving Plaintiffs of rights secured by the Fourth Amendment to the United States Constitution.

122.    Here, the City is directly liable because: (1) the City failed to establish any policy prohibiting the conflicts of interest that led to Plaintiffs' arrests despite having exclusive authority to do so; (2) the City failed to train its officers on recognizing and recusing from such conflicts despite the obvious need; (3) the City failed to supervise officers to ensure such obvious conflicts did not result in constitutional violations; (4) the City failed to require any meaningful investigation before authorizing arrests; and (5) these failures by the City itself-not merely Carlton's individual acts-were the moving force behind the violations.

123.    The City cannot shield itself by characterizing any individual officer's conduct as unauthorized when the City's own systemic failures created the conditions that made these violations inevitable. The City's deliberate indifference to obvious constitutional risks, despite having exclusive power to address them, establishes direct municipal liability.

124.    The City maintains final policymaking authority over its police department and is responsible for the training, supervision, and conduct of its officers, including Officer Carlton who acted as the City's agent throughout the investigation and arrest process.

125.    Carlton derived his authority to investigate crimes and make arrests solely from his employment with the Defendant and was acting within the scope of his official duties when he violated Plaintiffs' constitutional rights.

26

126.     The constitutional violations alleged herein were the direct and inevitable result of the City's own failures-either through unconstitutional official policies, longstanding customs or practices, or deliberate indifference to the need for adequate training and supervision.

127.     The City's failures were the moving force behind the constitutional violations. The causation is direct: had the City (1) established policies prohibiting officers from investigating complaints from individuals with whom they have romantic or close personal relationships; (2) trained officers to recognize such conflicts and recuse themselves; (3) required supervisory approval before arrests in cases involving such obvious conflicts; or (4) required any meaningful investigation before authorizing arrests based solely on a single complainant's word-then Plaintiffs' constitutional rights would not have been violated. The City had exclusive authority to implement each of these safeguards. The City's deliberate failure to do so, despite the obvious need and the high likelihood that such failures would result in constitutional violations, directly and proximately caused every harm Plaintiffs suffered.

128.     This causal link is not speculative but rather it is the inevitable consequence of the City's systemic failures. The City's deliberate indifference to obvious constitutional risks, combined with its exclusive policymaking authority, establishes direct municipal liability for its own inaction.

129.     Due to the malicious prosecution performed by the Defendant, the Plaintiffs were unable to gain employment for approximately 23 months until they could show proof they were acquitted.

130.    Plaintiffs suffered significant reputational harm in their professional community, loss of business opportunities including but not limited to rescinded job offers, loss of wages and income, and damage to their good standing as professional healthcare providers which all continue to present day.

131.    The wrongful arrests and criminal proceedings caused Plaintiffs to incur substantial legal fees and costs in defending themselves against baseless charges.

132.    Plaintiffs continue to suffer from the stigma and reputational damage caused by the wrongful arrests and the publicity surrounding the false charges.

133.    The trauma of being handcuffed, arrested, incarcerated and subjected to the criminal justice system has caused lasting psychological harm to both Plaintiffs. Plaintiffs suffered deprivation of liberty for 480 days while the baseless criminal prosecution continued, during which time they lived under the oppressive restraints and stigma of pending felony charges.

134.    Plaintiffs suffered severe physical and emotional suffering during their 33+ hour detention in unconstitutional conditions, including the deliberate denial of their constitutional right to make phone calls which directly caused the death of Plaintiffs' pet who was left without food, water, or care during their unlawful incarceration.

135.    Jadeyn lost his FOID (Firearm Owner's Identification) card as a result of the criminal charges.

136.    Jadeyn was unable to complete his education at Olivet University because of the criminal charges and defamatory conduct causing delays and financial constraints.

## COUNT I - 42 U.S.C. § 1983 CIVIL RIGHTS VIOLATION - FOURTH AMENDMENT
### (Unlawful Arrest Without Probable Cause)

137.     Plaintiffs reallege and incorporate by reference all preceding paragraphs, 1 through 137, as this Paragraph 138.

138.     Defendant City, as a municipal corporation with exclusive and final policymaking authority over its police department, deprived Plaintiffs of rights secured by the Fourth Amendment through the City's own deliberate indifference to obvious constitutional risks. The City maintains sole responsibility for establishing policies governing police conduct, training officers on constitutional requirements, and supervising officers to ensure compliance. No other entity had the power to establish policies governing conflicts of interest, require investigative procedures before arrests, train officers on recognizing bias in complainants, or supervise officers to ensure constitutional compliance. The City's exclusive authority means the City bears exclusive responsibility when its failures in these areas result in constitutional violations. Individual officers could only act with the authority the City vested in them; their badges, their power to arrest, their authority to initiate criminal proceedings-all derived solely from their status as the City's agents. When the City failed to constrain that power through adequate policies, training, and supervision, despite the obvious need to do so and despite having exclusive authority to implement such safeguards, the City became directly liable for the constitutional violations that predictably followed. The City's own deliberate indifference, not merely the acts of individual officers, violated Plaintiffs' constitutional rights.

29

139.    The constitutional violations alleged herein were the direct result of the City's own failures, establishing municipal liability under multiple independent theories: (1) if the City had a policy of permitting officers to investigate complaints from personal associates without recusal or oversight, that policy directly caused the violations; (2) if the City had a custom or practice of allowing such conflicts, even without formal policy, that custom directly caused the violations; (3) if the City lacked any policy addressing this obvious risk, that failure to establish policy constitutes deliberate indifference and directly caused the violations; (4) if the City had policies but failed to train officers on implementing them, that failure to train constitutes deliberate indifference and directly caused the violations; (5) if the City failed to supervise officers to ensure compliance with constitutional requirements, that failure to supervise constitutes deliberate indifference and directly caused the violations; and (6) if the City failed to require reasonable investigation before arrests, that failure directly caused the violations. Under any and all of these theories, the City is directly liable for its own constitutional failures. The City cannot escape liability by claiming individual officers acted outside policy, because the City's failure to have adequate policy, provide adequate training, and ensure adequate supervision is itself the constitutional violation. This is direct municipal liability for the City's own deliberate indifference to clearly established constitutional rights.

140.    The Fourth Amendment protects individuals from unreasonable seizures, including arrests without probable cause. Plaintiffs bring this claim to vindicate their right to be free from arrest without probable cause, a clearly established constitutional

right that the Defendant City violated through its deliberate indifference to obvious constitutional risks.

141.    The Fourth Amendment protects individuals from unreasonable seizures, including arrests without probable cause.

142.    Defendant's police officers lacked probable cause to arrest Plaintiffs and violated their Fourth Amendment rights by seizing them based solely on false and misleading information provided by a complainant with personal motivations.

143.    Probable cause requires facts sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime, based on an objective analysis of the totality of circumstances-not subjective beliefs of an officer.

144.    Probable cause exists if the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. A mere hunch or suspicion is not enough.

145.    Here, no such objective facts existed. The officers failed to conduct any reasonable investigation despite having readily available means to verify or refute Webb's allegations, including LLC formation documents, bank records, and Square account records that would have immediately established Plaintiffs' authorized status.

146.    The arrests were unreasonable under the Fourth Amendment as they were based entirely on the subjective, unverified word of a private citizen with a personal relationship to the arresting officer, without any independent investigation, corroborating evidence, or objective indicia of criminal activity.

## COUNT II - 42 U.S.C. 1983 CIVIL RIGHTS VIOLATION - FOURTH AMENDMENT
### (Unreasonable Seizure Pursuant to Legal Process - Malicious Prosecution)

147.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein. This claim addresses the ongoing seizure of Plaintiffs' liberty through the continuation of criminal proceedings after the initial arrest. To establish an unreasonable seizure pursuant to legal process (malicious prosecution) under 1983 and the Fourth Amendment, Plaintiffs must show: (1) Defendant initiated or continued criminal proceedings against Plaintiffs; (2) the proceedings were initiated without probable cause; (3) Plaintiffs suffered a seizure or deprivation of liberty as a consequence of the legal proceedings beyond the initial arrest; and (4) the criminal proceedings terminated in Plaintiffs' favor.

148.    To establish malicious prosecution under 1983 and the Fourth Amendment, Plaintiffs must show: (1) Defendant initiated or continued criminal proceedings against Plaintiffs; (2) the proceedings were initiated without probable cause; (3) Plaintiffs suffered a seizure or deprivation of liberty as a consequence of the legal proceedings; and (4) the criminal proceedings terminated in Plaintiffs' favor.

149.    Defendant instituted the proceedings maliciously through its agent Officer Carlton, as evidenced by the totality of circumstances surrounding the arrests. Officer Carlton, acting as an employee and agent of the City with full police authority granted by the City, initiated criminal proceedings against Plaintiffs without probable cause.

150.    As alleged extensively above, there was no probable cause for the criminal prosecution. The lack of probable cause is demonstrated by: Carlton's failure to conduct any investigation; reliance solely on allegations from his former romantic partner with

32

obvious financial bias; failure to review readily available documentary evidence; the transparently civil nature of the dispute; and the ultimate directed verdicts of acquittal demonstrating the complete absence of evidence.

151.     Plaintiffs suffered substantial and ongoing deprivation of liberty as a consequence of the criminal proceedings, extending far beyond the initial arrest. This unreasonable seizure pursuant to legal process continued for 480 days and included: (a) pretrial detention of over 33 hours in unconstitutional conditions; (b) bond conditions and restrictions on their freedom for the entire pretrial period; (c) mandatory court appearances over the 480-day prosecution period; (d) the continuous restraint and stigma of pending felony charges; (e) complete inability to obtain employment for approximately 23 months because background checks revealed the pending criminal charges; (f) loss of Jadeyn's FOID card; (g) Jadeyn's inability to complete his education due to the charges; (h) loss of professional reputation and standing throughout the community; and (i) 480 days of living under the oppressive weight of baseless criminal prosecution that prevented them from living freely and working in their profession. This extended seizure of liberty through legal process constitutes a distinct and ongoing Fourth Amendment violation separate from the initial unlawful arrest.

152.     The criminal proceedings terminated in Plaintiffs' favor through directed verdicts of acquittal. Under *Thompson v. Clark*, 142 S. Ct. 1332 (2022), to demonstrate favorable termination for purposes of a Fourth Amendment malicious prosecution claim under 1983, Plaintiffs need not show that the prosecution ended with affirmative indication of innocence. Plaintiffs need only show that the prosecution ended without a conviction.

Here, both Plaintiffs received directed verdicts-an extraordinary remedy reserved for cases where the evidence is so insufficient that no rational jury could convict. Cassie was acquitted by directed finding on the first day of trial, and Jadeyn on the second day. These directed verdicts constitute unequivocal favorable terminations.

153.    Malice may be inferred from absence of probable cause combined with other circumstantial evidence. For purposes of a Fourth Amendment malicious prosecution claim, malice is established when prosecution is initiated for any reason other than to bring a party to justice.

154.    Here, malice is established by the totality of circumstances: (1) Carlton's disqualifying personal and romantic relationship with complainant Webb; (2) Webb and Nilles' obvious financial motive to eliminate Plaintiffs from the business; (3) the ready availability of documentary evidence that would have immediately disproved the allegations; (4) the transparently civil nature of the business dispute; (5) the complete absence of any investigation whatsoever; (6) the suspicious timing immediately following Webb and Nilles' failed attempt to remove Plaintiffs through legitimate means; and (7) Carlton's disregard for Plaintiffs' constitutional rights in favor of his personal relationship. This conduct demonstrates that Carlton acted for improper purposes rather than legitimate law enforcement objectives.

155.    The City's failure to have adequate conflict-of-interest policies, failure to train officers on recognizing bias in complainants, failure to require reasonable investigation before arrests, and failure to supervise officers to ensure constitutional compliance

demonstrates deliberate indifference to constitutional rights and establishes direct municipal liability under § 1983.

156.     The City cannot shield itself from liability by characterizing any officer's actions as reckless, unauthorized, or outside the scope of proper police work. Municipal liability under Monell focuses on the adequacy of the municipality's own policies, training, and supervision-not on whether individual officers acted properly or improperly. Here, the ability of officers to commit these constitutional violations without any institutional checks, training, policies, or supervision to prevent them is precisely what establishes the City's direct liability.

157.     If officers acted without adequate training, it is because the City-which had exclusive authority to train them-failed to do so. If officers ignored proper procedures, it is because the City failed to establish, communicate, or enforce them. If officers abused their authority, it is because the City failed to supervise them or establish safeguards against such abuse.

158.     The City's systemic failures are the constitutional violation, and the City cannot escape responsibility for its own deliberate indifference by pointing to individual officer misconduct that its failures enabled and made inevitable. This is direct liability for the City's own actions and omissions, not vicarious liability for employee conduct.

159.     The direct causal chain establishes that the City's own failures were the but-for and proximate cause of every constitutional violation. First, the City failed to establish policies prohibiting conflicts of interest. Second, the City failed to train officers on recognizing and recusing from conflicts of interest. Third, the City failed to supervise

officers to ensure compliance with constitutional requirements. Fourth, the City failed to require any investigation before arrests. Fifth, as a result of these failures, officers were permitted to investigate and authorize arrests based on complaints from personal relationships without recusal, training, oversight, or required investigation. Sixth, Plaintiffs were arrested without probable cause. Seventh, Plaintiffs suffered 480 days of prosecution and all attendant harms. Each link in this chain was within the City's exclusive control. Each link was foreseeable and preventable through proper municipal policies, training, and supervision that only the City had authority to provide.

160.    The City's deliberate indifference to these obvious needs was the but-for cause and proximate cause of every constitutional violation Plaintiffs suffered. Remove any of the City's failures from this chain, and the violations would not have occurred. This is not vicarious liability for an employee's bad acts; this is direct liability for the City's own constitutional failures that set those bad acts in motion and made them inevitable.

161.    The criminal proceedings terminated in Plaintiffs' favor with directed verdicts of acquittal, demonstrating the complete lack of evidence supporting the arrests. If the Defendant could not produce sufficient evidence to survive a directed verdict motion after more than a year of investigation and discovery, it is inescapable that no reasonable officer could have believed probable cause existed at the time of the arrests.

WHEREFORE, Plaintiffs CASSANDRA LACEY and JADEYN LACEY respectfully request that this Court enter judgment in their favor and against Defendant CITY OF BLOOMINGTON, ILLINOIS, and award Plaintiffs the following relief:

36

A. Compensatory damages in an amount to be determined at trial for all economic losses, including lost wages, lost business opportunities, legal fees and costs incurred in defending the criminal proceedings, and other pecuniary losses;

B. Compensatory damages in an amount to be determined at trial for all non-economic losses, including emotional distress, psychological trauma, reputational harm, humiliation, loss of liberty, pain and suffering, and other dignitary harms;

C. Punitive damages in an amount sufficient to punish Defendant's deliberate indifference to Plaintiffs' constitutional rights and to deter similar future misconduct;

D. Reasonable attorney's fees and costs of suit pursuant to 42 U.S.C. 1988;

E. Pre-judgment and post-judgment interest as allowed by law;

F. Such other and further relief as this Court deems just, proper, and equitable.


Respectfully submitted,

/s/ Anish Parikh
Attorney for Plaintiff


**Parikh Law Group, LLC**
150 S. Wacker Drive, Suite 2400
Chicago, IL 60606
312-725-3476
Email: anish@plgfirm.com